**MAGNANIMO & DEAN, LLP**
Frank A. Magnanimo
21031 Ventura Boulevard
Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| HOWARD NEYSMITH, Derivatively on Behalf of KUSHCO HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ERIC BAUM, BARBARA GOODSTEIN, DONALD HUNTER, DALLAS IMBIMBO, NICHOLAS KOVACEVICH, CHRISTOPHER TEDFORD, JIM MCCORMICK, and CHRIS MARTIN, <br><br> Defendants, <br><br> -and- <br><br> KUSHCO HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Howard Neysmith ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant KushCo Holdings, Inc. ("KushCo" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by KushCo with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of KushCo against certain of its officers and directors seeking to remedy Defendants' (defined below) violations of state and federal law that have occurred from July 13, 2017 and April 9, 2019 (the "Relevant Period") and have caused substantial harm to the Company.

2.     The Company was founded in 2010 and is headquartered in Garden Grove, California. The Company was formerly known as Kush Bottles, Inc. and changed its name to KushCo Holdings, Inc. in September 2018.

3.     The Company primarily engages in the wholesale distribution of packaging supplies in the United States, Canada, Europe, and internationally.  The Company offers pop-top bottles; child resistant exit, paper exit, and foil barrier bags; tubes; and polystyrene, silicone-lined polystyrene or glass containers.  The Company also provides vaporizer cartridges, heating technologies, batteries, and disposable units; and hydrocarbon gases, including isobutene, n-butane, propane, ethanol, pre-mixes, custom blends, and other solvents.

4.     The Company's products are used by urban farmers, green house growers, and medical and recreational cannabis dispensaries.  In addition, the Company operates a creative design agency for cannabis and non-cannabis clients that provides brand strategy, design and marketing, Web application development, and e-commerce solutions.  The Company sells its products directly to consumers, as well as through website and re-distributors.

5.      In the past several years, the Company has expanded its services through the acquisition of several companies in the cannabis industry.  For example, in May 2017, the Company acquired CMP Wellness LLC ("CMP Wellness"), a privately-held manufacturer and distributor of Med-ePen brand vaporizer pens, cartridges, tanks, and accessories.  Then, in May 2018, the Company acquired Summit Innovations, LLC ("Summit"), a distributor of hydrocarbon products, such as propane and butane, to the legal cannabis industry.  Finally, in July 2018, the Company acquired The Hybrid Creative ("Hybrid"), a self-described premier creative agency for cannabis ventures, including branding, marketing, web, and strategy.

6.      Throughout the Relevant Period (July 13, 2017 through the present), the Company made materially false and misleading statements regarding its business, operational and compliance policies.  The Company made false and/or misleading statements and/or failed to disclose that: (i) it made material accounting errors in connection with its acquisitions of CMP Wellness, Summit, and Hybrid; (ii) as a result, its previously issued financial statements as of and for the fiscal years ended August 31, 2018 and August 31, 2017, included in its Annual Reports on Form 10-K for such periods, and financial statements as of and for the quarterly periods ended May 31, 2017, November 30, 2017, February 28, 2018, May 31, 2018 and November 30, 2018, included in its Quarterly Reports on Form 10-Q for such periods, could not be relied upon; (iii) its net loss for the fiscal year ended August 31, 2018, was more than twice as high than previously reported; (iv) the Company and its management's assurances that its financial statements for those fiscal years and periods were accurate and fairly reported could not be relied upon; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.      On April 9, 2019, the Company issued a press release, attached as an exhibit to the Company's Current Report on Form 8-K (the "April 2019 8-K"), announcing its decision to restate prior period financial statements for fiscal years 2017 and 2018 for non-cash items related to the acquisitions of CMP Wellness, Summit, and Hybrid.

8.      The April 2019 8-K disclosed that the Company had inaccurately accounted for certain shared-settled contingent consideration relating to its CMP Wellness, Summit, and Hybrid

acquisitions, by recording their respective earnout arrangements as equity rather than as liabilities, stating, in relevant part:

> On April 8, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of KushCo Holdings, Inc. (the "Company"), after discussion with management of the Company and the Company's independent registered public accounting firm, RBSM LLP ("RBSM"), concluded that ***the Company's previously issued audited consolidated financial statements as*** of and for the fiscal years ended August 31, 2018 and 2017 included in the Company's Annual Reports on Form 10-K for such periods and unaudited condensed consolidated interim financial statements as of and for the fiscal periods ended May 31, 2017, November 30, 2017, February 28, 2018, May 31, 2018 and November 30, 2018 included in the Company's Quarterly Reports on Form 10-Q for such periods should no longer be relied upon. Similarly, management's reports on the effectiveness of internal controls over financial reporting, earnings releases, and investor communications describing the financial statements for the periods described above should no longer be relied upon.

> ***As part of preparing its condensed consolidated interim financial statements as of and for the fiscal period ended February 28, 2019,*** the Company identified inadvertent errors in the accounting for certain shared-settled contingent consideration ("Contingent Consideration") relating to the Company's acquisition of CMP Wellness in May 2017, Summit Innovations in May 2018, and Hybrid Creative in July 2018. In connection with those acquisitions, Contingent Consideration relating to the respective earnout arrangements were recorded as equity. Upon further evaluation, the Company determined that the Contingent Consideration should have been accounted for as liabilities with changes in the fair value recorded in the Company's consolidated statements of operations.

> \* \* \*

> ***The Company expects the corrected misstatements to have the following impact on its restated annual consolidated financial statements:***

> - ***Increase net loss from $10.2 million to $24.3 million during its fiscal year ended August 31, 2018***;
> - Increase net income from $0.1 million to $1.7 million during its fiscal year ended August 31, 2017;
> - No impact on its net revenue or gross profit for any of the restated fiscal periods; and
> - No impact on its cash flows from operations for any of the restated fiscal periods.

> The Company intends to file such amended reports as soon as practicable.

*Management has concluded that the Company's internal control over financial reporting and its disclosure controls and procedures were not effective as of the end of the respective restatement periods.* The Company will amend any disclosures pertaining to its evaluation of such internal controls and procedures, as appropriate, in connection with the amended 10-K and 10-Q filings. In February 2019, the Company engaged a national accounting advisory firm to assist with the design and implementation of its internal controls over financial reporting based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. [Emphases added].

9.     On this news, the Company's stock price fell $0.45 per share, or 7.76%, to close at $5.35 on April 10, 2019.

10.    As a result of the Company's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has been sued for securities fraud.  As a result of all of the aforesaid, the Company has suffered damages, including increased costs and damage to its reputation.

## JURISDICTION AND VENUE

11.    Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

12.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of

1  fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received

2  substantial compensation in this District by doing business here and engaging in numerous

3  activities that had an effect in this District.

4  **PARTIES**

5  **Plaintiff**

6       14.    ***Plaintiff Howard Neysmith*** ("Plaintiff") is a current owner of KushCo's stock and

7  has held the stock during the time of the continuous wrongful course of conduct alleged herein.

8  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the

9  rights of the Company.

10  **Nominal Defendant**

11       15.    ***Nominal Defendant KushCo Holdings Inc.***   The Company is a Nevada

12  corporation with its principal executive offices located at 11958 Monarch Street, Garden Grove,

13  California 92841. KushCo's securities trade in an efficient market on the OTC Market Group's

14  OTCQB Over-the-Counter Bulletin Board ("OTCQB") under the symbol "KSHB."

15  **Director Defendants**

16       16.    ***Defendant Eric Baum*** ("Baum") has served as a member of the Board and is a

17  member of the Compensation Committee.

18       17.    ***Defendant Barbara Goodstein*** ("Goodstein") has served as a member of the Board

19  and is a member of the Governance and Nominating Committee.

20       18.    ***Defendant Donald H. Hunter*** ("Hunter") has served as a member of the Board.

21  Defendant Hunter is a member of the Audit Committee.

22       19.    ***Defendant Dallas Imbimbo*** ("Imbimbo") is a Co-Founder of Kush Bottles and has

23  served as member of the Board since 2010.  has served as a member of the Board since September

24  2012.    Defendant Imbimbo owns 10,942,427 shares of Company stock or 13.6% of the

25  outstanding shares of the Company.

26       20.    ***Defendant Nicholas Kovacevich*** ("Kovacevich") has served as the Chief Executive

27  Officer ("CEO") of KushCo at all relevant times and has served as Chairman of KushCo since

28  November 18, 2017.  Kovacevich is one of KushCo's co-founders.  Defendant Kovacevich is

named as a defendant in the securities class action entitled *May v. Kushco Holdings, Inc., et al.*, Case 8:19-cv-00798 (C.D. Cal.) ("Securities Class Action").   Defendant Kovacevich owns 11,310,000 shares of Company stock or 14.1% of the outstanding shares of the Company.

21.     Defendants Baum, Goodstein, Huntter, Imbimbo and Kovacevich are herein referred to as the "Director Defendants."

**Officer Defendants**

22.     ***Defendant Christopher Tedford*** ("Tedford") has served as the Chief Financial Officer ("CFO") of KushCo since November 2018.  Defendant Tedford is named as a defendant in the Securities Class Action.

23.     ***Defendant Jim McCormick*** ("McCormick") served as the CFO of KushCo from August 2017 until November 2018, and as Chief Operating Officer of KushCo from January 2018 until March 2019.  Defendant McCormick is named as a defendant in the Securities Class Action.

24.     ***Defendant Chris Martin*** ("Martin") served as the CFO of KushCo from July 2014 until July 2017.  Defendant Martin is named as a defendant in the Securities Class Action.

25.     ***Defendants Tedford, McCormick and Martin,*** along with the Director Defendants are herein referred to collectively as "Defendants."

### THE COMPANY'S CORPORATE GOVERNANCE

26.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

27.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

28.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to

control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

29.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

30.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

> (b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

> (c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

> (d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct

such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

31.      Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

32.      The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations, lawsuits and damage to its reputation.

**THE AUDIT COMMITTEE CHARTER**

33.      In addition to any other responsibilities that may be assigned from time to time by the Board, the Audit Committee shall:

Retain sole authority for appointing, compensating, retaining (subject to shareholder ratification) and overseeing the work of the independent auditors of the Company. The independent auditors shall report directly to the Committee.

Retain the sole authority to pre-approve all engagement fees and terms and all permissible non-audit services to be provided by the independent auditors.

Review and discuss with the independent auditors their audit procedures, including the audit plan and its scope with respect to the Company's consolidated

financial statements.

Evaluate the independent auditors' qualifications, performance and independence, and shall present its conclusions and recommendations with respect to the independent auditors to the Board on at least an annual basis. As part of such evaluation, the Committee shall:

- obtain and review a report or reports from the Company's independent auditors describing:

- the independent auditors' internal quality-control procedures;

  o any material issues raised by (i) the most recent internal quality-control review or peer review of the auditing firm, or (ii) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues; and

  o all relationships between the independent auditors and the Company;

- review and evaluate the lead partner and senior members of the independent auditors;

- assure the regular rotation of the audit partners as required by law as well as consider whether the independent auditors should be rotated, so as to assure continuing auditor independence; and

- recommend ratification of the independent auditors' appointment by the shareholders.

Establish clear hiring policies for employees or former employees of the independent auditor.

Evaluate the performance of the Company's internal audit function, whether staffed by employees or an outside firm, and review and discuss with the internal auditors the responsibilities, budget and staffing of the internal audit organization.

Meet separately with the internal auditors periodically to discuss audit plans, findings and action plans.

Review and discuss with the independent auditors and management the results of the annual audit of the Company's consolidated financial statements prior to filing with the SEC on Form 10-K or distribution thereof, including (i) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition

and Results of Operations" and (ii) any appropriate matters regarding accounting principles, practices and judgments and the independent auditors' opinion as to the quality thereof and any items required to be communicated to the Committee by the independent auditors in accordance with standards established and amended from time to time by the Public Company Accounting Oversight Board ("PCAOB") and the American Institute of Certified Public Accountants ("AICPA").

Review and discuss with management and the independent auditors the Company's interim financial results to be included in the Company's quarterly reports prior to filing with the SEC on Form 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and any items required to be communicated to the Committee by the independent auditors in accordance with existing PCAOB and AICPA guidance.

Review and discuss with management, the independent auditors, and the internal auditors the quality and adequacy of the Company's financial reporting processes, internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such processes, controls and procedures, material weaknesses in such processes, controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

Review and discuss with the independent auditors any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the independent auditors pursuant to existing PCAOB and AICPA guidance and resolve any disagreements between management and the independent auditors regarding financial reporting.

Review with management and the independent auditors:

- any analyses or other written communications prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the consolidated financial statements, including analyses of the effects of alternative United States GAAP methods on the financial statements;

- the critical accounting policies and practices of the Company;

- off-balance sheet transactions and structures;

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- regulatory and accounting initiatives or actions applicable to the Company (including any SEC investigations or proceedings), and
- other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences.

Recommend to the Board whether the Company's consolidated financial statements should be accepted for inclusion in the Company's annual report on Form 10-K.

Review and discuss generally with management the types of information to be disclosed and the types of presentations to be made in the Company's earnings press release, paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. It is not expected that the Committee will pre-approve each such release or guidance.

Keep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the company; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties.

Review the Company's policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial and fraud risk exposures and the steps that management has taken to monitor and control such exposures.

Periodically review risk assessments from management with respect to cyber security, including assessments of the overall threat landscape and related strategies and investments.

Periodically review global tax matters and risks with management and appropriate internal and external tax specialists.

Approve the Company's Code of Conduct and review the implementation and effectiveness of the Company's compliance program, including violations of the Code of Conduct and responses thereto and the adequacy of resources for compliance.

Meet periodically with management and Outside Counsel to discuss and review legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policy and any material reports or inquiries from regulators or government agencies.

Establish procedures for:

- the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and

- the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

Review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) on an ongoing basis, in accordance with Company policies and procedures Reporting to the Board; Evaluation of Performance; Other Activities

Report to the Board on a regular basis, and this report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications, independence and performance of the Company's independent auditors and the performance of the internal audit and compliance functions.

At least annually, (i) evaluate its own performance and report to the Board on such evaluation and (ii) review and assess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

Prepare a report to stockholders to be included in the Company's annual proxy statement as required by the SEC and file with the relevant stock exchange any reports that may be required with respect to the Committee.

The Committee shall perform any other activities consistent with the Company's Articles of Incorporation, as amended, By-Laws and governing law as the Committee or the Board deems necessary or appropriate.

## BACKGOUND AND THE COMPANY'S FALSE STATEMENTS

34.     In the past several years, the Company has expanded its services through the acquisition of several companies in the cannabis industry.

35.     In May 2017, the Company acquired CMP Wellness, a privately held manufacturer and distributor of MedePen brand vaporizer pens, cartridges, tanks, and accessories.

36.     In May 2018, the Company acquired Summit, a distributor of hydrocarbon products, such as propane and butane, to the legal cannabis industry.

37.     In July 2018, the Company acquired Hybrid, a self-described premier creative agency for cannabis ventures, including branding, marketing, web, and strategy.

38.     The Relevant Period begins on July 13, 2017, when the Company filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarterly period ended May 31, 2017 (the "3Q 2017 10-Q"). For the period, the Company reported a net income of $0.01 million, or $0.00 per diluted share, on net revenue of $4.72 million, compared to a net income of $0.02 million, or $0.00 per diluted share, on net revenue of $2.32 million for the same period the prior fiscal year.

39.     With regard to the Company's acquisition of CMP Wellness and the Company's subsequent contingent consideration equity, the 3Q 2017 10-Q stated:

In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company recorded a contingent liability for the contingent cash consideration of $1,735,375 and recorded contingent equity consideration of $10,763,760. The fair value of the contingent equity consideration is recorded in additional paid in capital.

The acquisition is accounted for under the acquisition method of accounting in accordance with Accounting Standards Codification Topic 805, Business Combinations ("ASC 805"). As such, CMP's assets acquired and liabilities assumed are recorded at their acquisition-date fair values. The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of assets acquired and liabilities assumed is allocated to goodwill. Pursuant to ASC 805, the contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration was also calculated based on the negotiated price per share of

common stock of the Company of $2.50, which approximated the quoted market price.

40.     With regard to the Company's acquisition of CMP Wellness and the Company's subsequent contingent consideration liability, the 3Q 2017 10-Q stated:

> The Company has a contingent consideration liability of $1,785,375, which consists of contingent cash consideration of $1,735,375 resulting from the acquisition of CMP . . . .   The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no financial assets or liabilities that are measured at fair value on a recurring basis as of August 31, 2016.

> * * *

> During the three months ended May 31, 2017, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,785,375 from its inception date of May 1, 2017 and May 3, 2017.

41.     Additionally, while the 3Q 2017 10-Q noted that the Company's internal control over financial reporting was not effective for that period because of, *inter alia*, missing policies and levels of supervision, it nonetheless minimized current and future risks associated with those weaknesses.  For instance, the 3Q 2017 10-Q assured investors that the Company "believe[s] that the weaknesses identified . . . have not had any material effect on our financial results," and that "[m]anagement believes that despite our material weaknesses . . . our financial statements for the three and nine month periods ended May 31, 2017 are fairly stated, in all material respects, in accordance with U.S. GAAP."

42.     The 3Q 2017 10-Q also stressed that the Company was "currently reviewing our disclosure controls and procedures related to these material weaknesses" and expected "to implement changes in the current fiscal year, including identifying specific areas within our governance, accounting and financial reporting processes to add adequate resources to potentially mitigate these material weaknesses."

43.     The 3Q 2017 10-Q also reassured investors that its management would "continue to monitor and evaluate the effectiveness of our internal controls and procedures and our internal controls over financial reporting on an ongoing basis," and that management was "committed to

- 14 -

taking further action and implementing additional enhancements or improvements, as necessary and as funds allow."

44.     As part of "Management's Remediation Plan," the 3Q 2017 10-Q highlighted that the Company would: (i) "appoint additional qualified personnel to address inadequate segregation of duties and implement modifications to our financial controls to address such inadequacies"; (ii) "adopt a written whistleblower policy and code of ethics"; and (iii) "appoint an independent board of directors, including board committees related to financial controls and reporting."  The 3Q 2017 10-Q promised that "[t]he remediation efforts set out herein will be implemented in the current 2017 fiscal year."

45.     The 3Q 2017 10-Q also contained merely generic, boilerplate warnings that an error in financial reporting could occur despite the Company's implementation of internal controls, stating, in relevant part:

> Because of its inherent limitations, internal controls over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

46.     Appended as exhibits to the 3Q 2017 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") wherein Defendant Kovacevich certified that "[t]he [3Q 2017 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [3Q 2017 10-Q] fully presents, in all material respects, the financial condition and results of operations or the Company."

47.     On November 28, 2017, the Company filed its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year ended August 31, 2017 (the "2017 10-K").  For fiscal year 2017, the Company reported a net income of $0.07 million, or $0.00 per diluted share, on net revenue of $18.80 million, compared to a net income of $0.07 million, or $0.00 per diluted share, on net revenue of $8.22 million for fiscal year 2016.

48.     With regard to the Company's acquisition of CMP Wellness and the Company's subsequent contingent consideration equity, the 2017 10-K stated, in relevant part:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 $1,905,000 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. The fair value of the contingent equity consideration is recorded in additional paid in capital.

> * * *

> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

> The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

49.     With regard to the Company's acquisition of CMP Wellness and the Company's subsequent contingent consideration liability, the 2017 10-K stated:

The Company has a contingent consideration liability of $1,820,000, which consists of contingent cash consideration of $1,820,000 resulting from the acquisition of CMP . . . . The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of August 31, 2017 and 2016.

* * *

During the year ended August 31, 2017, the Company recognized a change in the fair value of its contingent consideration liability of $169,625, which increased liability from $1,735,375 to $1,905,000. A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000.

50.     The 2017 10-K also contained substantively the same warnings and reassurances as above regarding its still-ineffective internal control over financial reporting, including the assurance that the Company "believe[s] that the weaknesses identified . . . have not had any material effect on our financial results," and that "[m]anagement believes that despite our material weaknesses . . . our financial statements for the year ended August 31, 2017 are fairly stated, in all material respects, in accordance with U.S. GAAP." However, where the 3Q 2017 10-Q repeatedly asserted that the Company would make its remedial changes in the Company's 2017 fiscal year, the 2017 10-K now promised that the Company would implement these changes in the Company's 2018 fiscal year.

51.     Appended as exhibits to the 2017 10-K were signed SOX certifications wherein Defendants Kovacevich and McCormick "certifie[d] to [their] knowledge that the [2017 10-K] . . . fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended . . . and that the information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

52.     On January 16, 2018, the Company filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarterly period ended November 30, 2017 (the "1Q 2018 10-Q"). For the period, the Company reported a net income of

$0.10 million, or $0.00 per diluted share, on net revenue of $8.85 million, compared to a net loss of $0.16 million, or $0.00 per diluted share, on net revenue of $2.47 million for the same period the prior fiscal year.

53.     With regard to the Company's acquisition of CMP Wellness and its subsequent contingent consideration equity, the 1Q 2018 10-Q stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 $1,905,000 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. The fair value of the contingent equity consideration is recorded in additional paid in capital.

> * * *

> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

> The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

54.     With regard to the Company's acquisition of CMP Wellness and the Company's

subsequent contingent consideration liability, the 1Q 2018 10-Q stated:

> The Company has a contingent consideration liability of $1,820,000, which consists of contingent cash consideration of $1,820,000 resulting from the acquisition of CMP . . . . The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period.  The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of November 30, 2017.

> \* \* \*

> During the three months ended November 30, 2017, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,820,000.

55.     As with the 3Q 2017 10-Q and 2017 10-K, the 1Q 2018 10-Q once again noted that the Company's internal control over financial reporting was not effective.  However, unlike the 3Q 2017 10-Q and 2017 10-K, the 1Q 2018 10-Q did not promise to address the material weaknesses in its financial reporting within the current fiscal year, stating, in relevant part:

> The material weaknesses that existed on August 31, 2017 are described in Part II, Item 9A – Controls and Procedures in our most recent Annual Report on Form 10-K, filed on November 29, 2017.  Due to a lack of financial resources and size, we are not able to, and do not intend to, immediately take any action to remediate these material weaknesses.  We will not be able to do so until we acquire sufficient financing to do so.  We will implement further controls as circumstances, cash flow, and working capital permit.

56.     Nonetheless, as with the 3Q 2017 10-Q and 2017 10-K, the 1Q 2018 10-Q reassured investors that their financial statements could be relied upon, minimizing both present and future risks associated with their financial reporting:

> Notwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified in this report, we believe that our financial statements fairly present our financial position, results of operations and cash flows for the periods covered thereby in all material respects.

> We have taken steps to enhance our internal control over financial reporting and plan to take additional steps to remediate the material weaknesses. Specifically:

> 1.   We appointed additional independent members with public company board

experience to our board of directors,

(ii)     We added staff to our finance team, and outsourced to third party the assessment of certain complex transactions under US GAAP

2.   On January 2018, we hired a controller with public company experience

We believe that the measures described above will strengthen our internal control over financial reporting. We expect that our efforts, including design, implementation and testing will continue throughout fiscal year 2018.

57.     Appended as exhibits to the 1Q 2018 10-Q were signed SOX certifications wherein Defendants Kovacevich and McCormick "certifie[d] to [their] knowledge that the Company's [1Q 2018 10-Q] . . . fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended . . . and that the information contained in the [1Q 2018 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

58.     On April 13, 2018, the Company filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarterly period ended February 28, 2018 (the "2Q 2018 10-Q").   For the period, the Company reported a net loss of $7.61 million, or $0.12 per diluted share, on net revenue of $10.36 million, compared to a net income of $0.00 million, or $0.00 per diluted share, on net revenue of $2.97 million for the same period the prior fiscal year.

59.     With regard to the Company's acquisition of CMP Wellness and the Company's subsequent contingent consideration equity, the 2Q 2018 10-Q stated:

In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets.   The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 and recorded contingent equity consideration of $10,763,760.   Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400.   A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000. During the six months ended February, a payment of $170,000 was made towards this liability, resulting in a net liability of $1,650,000.   During the three months ended February

28, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,650,000.

\* \* \*

The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period.  Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

60.    With regard to KushCo's acquisition of CMP Wellness and the Company's subsequent contingent consideration liability, the 2Q 2018 10-Q stated:

The Company has a contingent consideration liability of $1,650,000 which consists of contingent cash consideration of $1,650,000 resulting from the acquisition of CMP . . . . The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of February 28, 2018.

\* \* \*

During the year ended August 31, 2017, the Company recognized a change in the fair value of its contingent consideration liability of $169,625, which increased liability from $1,735,375 to $1,905,000.  A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of

$1,820,000. During the six months ended February, a payment of $170,000 was made towards this liability, resulting in a net liability of $1,650,000. During the three months ended February 28, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,650,000.

61.     Additionally, the 2Q 2018 10-Q contained substantively the same warnings and reassurances above regarding its still-ineffective internal control over financial reporting, including the assurance that "[n]otwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified" in the 2017 10-K, "we believe that our financial statements fairly present our financial position, results of operations and cash flows for the periods covered thereby in all material respects."

62.     The 2Q 2018 10-Q also touted the Company's enhanced remedial efforts since the 1Q 2018 10-Q, stating:

We have taken steps to enhance our internal control over financial reporting and plan to take additional steps to remediate the material weaknesses. Specifically:

(i)     We appointed additional independent members with public company board experience to our board of directors, such that our board of directors is now composed of a majority of independent directors;

(ii)     On March 9, 2018, our board of directors formed an Audit Committee composed entirely of independent directors that will, among other things, assist the board of directors in its oversight of the integrity of our financial statements and our financing reporting processes and systems of internal control;

(iii)     We have adopted a Code of Business Conduct and Ethics and a whistleblower policy;

(iv)     We added staff to our finance team, and outsourced to third party the assessment of certain complex transactions under US GAAP; and

(v)     On January 2018, we hired a controller with public company experience

We believe that the measures described above will strengthen our internal control over financial reporting. We expect that our efforts, including design, implementation and testing will continue throughout fiscal year 2018.

63.     Appended as exhibits to the 2Q 2018 10-Q were signed SOX certifications wherein Defendants Kovacevich and McCormick "certifie[d] to [their] knowledge that the Company's [2Q 2018 10-Q] . . . fully complies with the requirements of Section 13(a) of 15(d), as applicable, of the Securities Exchange Act of 1934, as amended . . . and that the information contained in the [2Q 2018 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company. "

64.     On July 13, 2018, the Company filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarterly period ended May 31, 2018 (the "3Q 2018 10-Q").  For the period, the Company reported a net loss of $2.17 million, or $0.03 per diluted share, on net revenue of $12.91 million, compared to a net income of $0.01 million, or $0.00 per diluted EPS, on net revenue of $4.72 million for the same period the prior fiscal year.

65.     With regard to the Company's acquisition of CMP Wellness and its subsequent contingent consideration equity, the 3Q 2018 10-Q stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 and recorded contingent equity consideration of $10,763,760.  Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000. During the six months ended February, a payment of $170,000 was made towards this liability, resulting in a net liability of $1,650,000. During the three months ended May 31, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,650,000.
>
> * * *
>
> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the

fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the
acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

66.     With regard to the Company's acquisition of Summit and its subsequent contingent consideration, the 3Q 2018 10-Q stated:

The [Summit] acquisition was accounted for using the acquisition method of accounting in accordance with ASC 805, Business Combinations. The consideration paid to the Members of Summit at the closing included the Cash Consideration, consisting of an aggregate of $1.4 million in cash, net of cash received and the Share Consideration, consisting of an aggregate of 1,280,000 shares common stock. $500,000 of the Cash Consideration and approximately 640,000 shares of common stock from the Share Consideration were held back by the Company for a period of 15 months for potential post-closing working capital and/or indemnification claims relating to, among other things, breaches of representations, warranties and covenants contained in the Merger Agreement. The Members may become entitled to receive earn-out consideration of up to an additional 1,280,000 shares of common stock, in the aggregate, based on the net revenue performance of the Summit business during a one-year period following the closing.

The Company estimated the probability of the contingent consideration at 100% and recorded the earn-out consideration of the additional 1,280,000 shares of common stock in stockholders' equity.

67.     With regard to the Company's acquisition of CMP Wellness and Summit, and its subsequent contingent consideration liability, the 3Q 2018 10-Q stated:

- 24 -

The Company has a contingent consideration liability of $2,150,000 which consists of contingent cash consideration of $1,650,000 resulting from the acquisition of CMP and $500,000 resulting from the acquisition of Summit. The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones.  This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of May 31, 2018.

* * *

During the nine months ended May 31, 2018, a payment of $170,000 was made towards this liability, an increase of $500,000 resulted from the Summit acquisition, resulting in a net liability of $2,150,000. During the three months ended May 31, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $2,150,000.

68.    The 3Q 2018 10-Q also contained substantively the same warnings and reassurances as above regarding its still-ineffective internal control over financial reporting, including the assurance that "[n]otwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified" in the 2017 10-K, "we believe that our financial statements fairly present our financial position, results of operations and cash flows for the periods covered thereby in all material respects." Additionally, the 3Q 2018 10-Q also touted the same enhanced remedial measures as the 2Q 2018 10-Q.

69.    Appended as exhibits to the 3Q 2018 10-Q were signed SOX certifications wherein Defendants Kovacevich and McCormick "certifie[d] to [their] knowledge that the Company's [3Q 2018 10-Q] . . . fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended . . . and that the information contained in the [3Q 2018 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company. "

70.    On November 29, 2018, the Company filed its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year ended August 31, 2018 (the "2018 10-K").  For fiscal year 2018, the Company reported a net loss of $10.20 million, or $0.16 per diluted share, on net revenue of $52.08 million, compared to a net income of $0.07 million, or $0.00 per diluted share, on net revenue of $18.80 for fiscal year 2017.

71.     With regard to the Company's acquisition of CMP Wellness and its subsequent contingent consideration equity, the 2018 10-K stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 $1,905,000 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. The fair value of the contingent equity consideration is recorded in additional paid in capital.
>
> * * *
>
> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.
>
> * * *
>
> The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

72.     With regard to the Company's acquisition of Summit, the 2018 10-K noted an estimated fair value contingent equity consideration of $3,193,907, and a total fair value of

consideration and total estimated acquisition consideration of $10,680,666, as adjusted for August 31, 2018, compared to an estimated fair value contingent equity consideration of $7,155,200, and a total fair value of consideration and total estimated acquisition consideration of $15,755,618, as initially reported May 2, 2018.  The 2018 10-K also stated:

> The [Summit] acquisition was accounted for using the acquisition method of accounting in accordance with ASC 805, Business Combinations. The consideration paid to the Members of Summit at the closing included the Cash Consideration, consisting of an aggregate of $905,231 in cash, net of cash received, $187,849 in cash held back and the Share Consideration, consisting of an aggregate of 1,280,000 shares common stock. $187,849 of the Cash Consideration and approximately 640,000 shares of common stock from the Share Consideration were held back by the Company for a period of 15 months for potential post-closing working capital and/or indemnification claims relating to, among other things, breaches of representations, warranties and covenants contained in the Merger Agreement. The Members may become entitled to receive earn-out consideration of up to an additional 1,280,000 shares of common stock, in the aggregate, based on the net revenue performance of the Summit business during a one-year period following the closing.

73. With regard to the Company's acquisition of Hybrid, the 2018 10-K noted an estimated fair value contingent equity consideration of $920,000, and a total fair value of consideration and total estimated acquisition consideration of $4,178,492. The 2018 10-K also stated:

> The [Hybrid] acquisition was accounted for using the acquisition method of accounting in accordance with ASC 805, Business Combinations. The consideration paid to the Members of Hybrid at the closing included the Cash Consideration, consisting of an aggregate of $847,187 in cash, net of cash received, $82,106 in cash held back and the Share Consideration, consisting of an aggregate of 360,000 shares common stock. $82,106 of the Cash Consideration and 162,000 shares of common stock from the Share Consideration were held back by the Company issuable on January 1, 2019.  The Members may become entitled to receive earn-out payments of up to $1.37 million, through a combination of cash and stock payments, based on the net revenue performance of the Hybrid business during the period September 1, 2018 through August 31, 2019.

74. The 2018 10-K also noted that the Company's internal control over financial reporting was still ineffective, but that it suffered from fewer material weaknesses, now including only "inadequate segregation of duties consistent with control objectives" and a "lack of multiple levels of supervision and review."  The 2018 10-K also assured investors that while "[c]ertain of

the material weaknesses in internal control over financial reporting as of August 31, 2018 . . . remain unchanged from August 31, 2017," the Company nonetheless "believe[s] that the weaknesses identified . . . have not had any material effect on our financial results," and that "[m]anagement believes that despite our material weaknesses set forth above, our financial statements for the fiscal year ended August 31, 2018 are fairly stated, in all material respects, in accordance with U.S. GAAP."

75.     Moreover, the 2018 10-K contained substantively the same merely generic, boilerplate warnings that an error in financial reporting could occur despite the Company's implementation of internal controls.  The 2018 10-K noted that it would continue management's remediation plan for its remaining material weaknesses in internal control over financial reporting in the Company's 2019 fiscal year.

76.     Appended as exhibits to the 2018 10-K were signed SOX certifications wherein Defendants Kovacevich and Tedford "certifie[d] to [their] knowledge that the Company's [2018 10-K] . . . fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended . . . and that the information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

77.     On January 8, 2019, the Company filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarterly period ended November 30, 2018 (the "1Q 2019 10-Q"). For the period, the Company reported a loss of $8.19 million, or $0.10 per diluted share, on net revenue of $25.32 million, compared to a net income of $0.10 million, or $0.00 per diluted share, on net revenue of $8.85 million for the same period the prior fiscal year.

78.     With regard to the Company's contingent consideration from its acquisition of CMP Wellness, Summit, and Hybrid, the 1Q 2019 10-Q stated:

> The Company has contingent consideration outstanding associated with its prior business combinations. The Company accounts for business combinations under the acquisition method and allocates the total purchase price for acquired businesses to the tangible and identified intangible assets acquired and liabilities

assumed, based on their estimated fair values as of the acquisition date. A liability for contingent consideration, if applicable, is recorded at fair value as of the acquisition date and, evaluated each period for changes in the fair value and adjusted as appropriate.

The Company's contingent consideration as of November 30, 2018 was $672,849, consisting of $187,849 from the Summit acquisition and $485,000 from the Hybrid acquisition.

The Company's contingent consideration as of August 31, 2018 was $754,955, consisting of $187,849 from the Summit acquisition and $532,106 from the Hybrid acquisition.

79.     The 1Q 2019 10-Q also noted that the Company's internal control over financial reporting was still ineffective because it suffered from the same material weaknesses identified in the 2018 10-K.  The 1Q 2019 10-Q nonetheless continued to tout the Company's remediation measures, which included the same measures identified in the Company's 2Q 2018 10-Q and 3Q 2018 10-Q with the addition of the Company's "hiring of [the Company's] new Chief Financial Officer, Christopher Tedford, with significant sales and distribution experience who will focus on the development of the finance and accounting function."

80.     While the 1Q 2019 10-Q did not contain the same assurances as its previous reports that the Company and its management believed their financial statements and representations were accurate and fairly presented despite material weaknesses in the Company's internal controls, the 1Q 2019 10-Q nonetheless assured investors that "[t]here ha[d] been no change in [the Company's] internal control over financial reporting" regarding "the effectiveness of [the Company's] internal control over financial reporting" that occurred during the period, "that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

81.     Appended as exhibits to the 1Q 2019 10-Q were signed SOX certifications wherein Defendants Kovacevich and Tedford "certifie[d] to [their] knowledge that the Company's [1Q 2019 10-Q] . . . fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended . . . and that the information contained in the [1Q 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

82.     The statements referenced above were materially false and misleading because the Company made false and/or misleading statements, as well as failed to disclose material adverse facts about its business, operational and compliance policies.  Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (a) the Company made material accounting errors in connection with its acquisitions of CMP Wellness, Summit, and Hybrid; (b) as a result, the Company's previously issued financial statements as of and for the fiscal years ended August 31, 2018 and August 31, 2017, included in the Company's Annual Reports on Form 10-K for such periods, and financial statements as of and for the quarterly periods ended May 31, 2017, November 30, 2017, February 28, 2018, May 31, 2018 and November 30, 2018, included in the Company's Quarterly Reports on Form 10-Q for such periods, could not be relied upon; (c) the Company's net loss for the fiscal year ended August 31, 2018, was more than twice as high than previously reported; (d) the Company and its management's assurances that its financial statements for those fiscal years and periods were accurate and fairly reported could not be relied upon; and (e) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

83.     On April 9, 2019, the Company issued a press release, attached as an exhibit to the Company's Current Report on Form 8-K, announcing its decision to restate prior period financial statements for fiscal years 2017 and 2018 for non-cash items related to acquisitions of CMP Wellness, Summit, and Hybrid.

84.     Specifically, the April 2019 8-K disclosed that the Company had inaccurately accounted for certain shared-settled contingent consideration relating to its CMP Wellness, Summit, and Hybrid acquisitions, by recording their respective earnout arrangements as equity rather than as liabilities, stating:

> On April 8, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of KushCo Holdings, Inc. (the "Company"), after discussion with management of the Company and the Company's independent registered public accounting firm, RBSM LLP ("RBSM"), concluded that *the Company's previously issued audited consolidated financial statements as of and for the fiscal years ended August 31, 2018 and 2017 included in the Company's Annual Reports on*

*Form 10-K for such periods and unaudited condensed consolidated interim financial statements as of and for the fiscal periods ended May 31, 2017, November 30, 2017, February 28, 2018, May 31, 2018 and November 30, 2018 included in the Company's Quarterly Reports on Form 10-Q for such periods should no longer be relied upon. Similarly, management's reports on the effectiveness of internal controls over financial reporting, earnings releases, and investor communications describing the financial statements for the periods described above should no longer be relied upon.*

As part of preparing its condensed consolidated interim financial statements as of and for the fiscal period ended February 28, 2019, *the Company identified inadvertent errors in the accounting for certain shared-settled contingent consideration ("Contingent Consideration") relating to the Company's acquisition of CMP Wellness in May 2017, Summit Innovations in May 2018, and Hybrid Creative in July 2018. In connection with those acquisitions, Contingent Consideration relating to the respective earnout arrangements were recorded as equity. Upon further evaluation, the Company determined that the Contingent Consideration should have been accounted for as liabilities with changes in the fair value recorded in the Company's consolidated statements of operations*.

\* \* \*

The Company expects the corrected misstatements to have the following impact on its restated annual consolidated financial statements:

- *Increase net loss from $10.2 million to $24.3 million during its fiscal year ended August 31, 2018*;
- Increase net income from $0.1 million to $1.7 million during its fiscal year ended August 31, 2017;
- No impact on its net revenue or gross profit for any of the restated fiscal periods; and
- No impact on its cash flows from operations for any of the restated fiscal periods.

The Company intends to file such amended reports as soon as practicable.

*Management has concluded that the Company's internal control over financial reporting and its disclosure controls and procedures were not effective as of the end of the respective restatement periods.* The Company will amend any disclosures pertaining to its evaluation of such internal controls and procedures, as appropriate, in connection with the amended 10-K and 10-Q filings. In February 2019, the Company engaged a national accounting advisory firm to assist with the design and implementation of its internal controls over financial reporting based on the criteria established in Internal Control - Integrated Framework (2013) issued by

the Committee of Sponsoring Organizations of the Treadway Commission. [Emphasis added].

85.     On this news, the Company's stock price fell 7.76%, $0.45 per share, to close at $5.35 on April 10, 2019.

86.     As a result of the wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

88.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

89.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

90.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

91.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

92.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

93. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

94. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

95. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Kovacevich**

96. Defendant Kovacevich is not disinterested or independent, and therefore, is incapable of considering demand because Kovacevich (as CEO of the Company) is an employee of the Company who derives substantially all of her income from his employment with the Company, making him not independent. As such, Kovacevich cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

97. This lack of independence and financial benefits received by Kovacevich renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

98. In addition, Kovacevich is a defendant in the Securities Class Action.

99. As such, Defendant Kovacevich cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo**

100.    Defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the purposes of the Committee are to assist the Board in fulfilling its oversight responsibilities related to: (a) the integrity of the Company's financial statements and the Company's financial reporting processes and systems of internal control; (b) the qualifications, independence and performance of the Company's independent auditors and the performance of the Company's internal auditors and internal audit function; (c) the Company's compliance with legal and regulatory requirements; (d) enterprise risk management and data security; and (e) the implementation and effectiveness of the Company's ethics and compliance program; and (f) prepare the Audit Committee Report that Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement.

101.    Defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein.  Thus, Defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendant Baum**

102.    Defendant Baum has business connections to Defendants Kovacevich and Imbimbo. Defendant Baum was an investor in KushCo and assisted the Company get off the ground.  As of December 28, 2018, Defendant Baum owned 1.1% of the Company's stock. According to an April 22, 2018 article published by the Cannabis Business Executive, Defendants Kovacevich and Imbimbo have been able to "call on the expertise Eric Baum, a friend and board member . . . who has brought much needed insight and strategic thinking to the team."

**COUNT I**

**Against the Director Defendants for Breach of Fiduciary Duty**

103.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.   The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

105.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

106.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

107.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

108.   As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against Defendants for Waste of Corporate Assets

109.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

111.    As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

112.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

113.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III
### Against Defendants for Violations of Section 10(b)
### of the Exchange Act and SEC Rule 10b-5

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    During the Relevant Period, Defendants disseminated or approved public statements that misrepresented or failed to disclose that (a) the Company's stock was prone to manipulation through paid stock promotions; (b) such conduct would subject the Company to heightened regulatory scrutiny by the SEC; and (3) the Company's public statements were false and misleading and/or lacked a reasonable basis at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

116.    As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT IV**

**Against Individual Defendants for Violations of**
**<u>Section 14(a) of the Exchange Act</u>**

118.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

120.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

121.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

122.   Under the direction and watch of the Directors, the 2018 Proxy Statement (the "Proxy Statement") failed to disclose that the Company's internal control over financial reporting was not effective due to a number of "material weaknesses, which are indicative of many small companies with small staff."  These material weaknesses included: (i) inadequate segregation of duties consistent with control objectives; (ii) lack of a code of ethics; (iii) lack of a whistleblower

policy; (iv) lack of an independent Board or Board committees related to financial reporting; and (v) lack of multiple levels of supervision and review.

123.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ pay for performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the lack of internal controls and therefore any compensation based on the Company's financial performance was artificially inflated.

124.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to, election of directors and ratification of an independent auditor.

125.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Baum, Goodstein, Hunter, Imbimbo and Kovacevich, which allowed them to continue breaching their fiduciary duties to the Company.

126.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

127.    Plaintiff on behalf of the Company has no adequate remedy at law

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply

with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees;

(E)    Requiring that the Company add at least two female directors to the Board, as mandated by California Senate Bill 826, which requires publicly held companies based in California with five directors to have a minimum of two females on their boards of directors;

(F)    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein:

(i)    a proposal to strengthen the Company's controls over financial reporting;

(ii)    a proposal to strengthen the Company's oversight of its disclosure procedures;

(iii)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

(iv)    a proposal to add at least three truly independent directors; and

(v)    a provision to permit the stockholders of the Company to nominate at least three candidates for election to the Board;

(G)    Awarding such other and further relief as is just and equitable

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

//

//

//

1    Dated: May 31, 2019

2

3                                **MAGNANIMO & DEAN, LLP**

4                                By: *_/s/ Frank A. Magnanimo_*
                                   Frank A. Magnanimo

5                                21031 Ventura Boulevard
                               Suite 803

6                                Woodland Hills, CA 91364
                               Telephone: (818) 305-3450
                               Facsimile: (818) 305-3451

7                                Email: Frank@MagDeanLaw.com

8                                **GAINEY McKENNA & EGLESTON**
                               Thomas J. McKenna

9                                Gregory M. Egleston
                               440 Park Avenue South, 5th Floor

10                               New York, NY 10016
                              Telephone: (212) 983-1300
                              Facsimile: (212) 983-0383

11                               Email: tjmckenna@gme-law.com
                              Email: gegleston@gme-law.com

12

13                               ***Attorneys for Plaintiff***

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, Howard Neysmith, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Kuschco Holdings, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Kuschco Holdings, Inc. common stock at all relevant times.

Howard Neysmith